SETTLEMENT FUNDING, LLC,
d/b/a/ Peachtree Settlement
Funding, Plaintiff,

v.

JAMESTOWN LIFE INSURANCE
COMPANY and First Colony Life
Insurance Company, Defendants.

No. 1:98CV03204–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 16, 1999.

Joseph Duane Wargo, J. Scott Carr, Altman Kritzer & Levick, Atlanta, GA, for Plaintiff.

Ben Kingree, III, Carter & Ansley, Atlanta, GA, for Defendants.

## ORDER

MOYE, District Judge.

The above-styled action is before the court on 1) plaintiff's motion for summary judgment [# 10]; 2) defendants' cross-motion for summary judgment [# 16]; 3) plaintiff's motion for leave to file sur-reply in support of its motion for summary judgment [# 24]; and 4) plaintiff's objections to Booker Affidavit [# 21–2].

## FACTS

On or about October 12, 1990, Edwin Wilson Biddix, individually and as Guardian ad Litem for Joseph Edwin Biddix, and Cynthia Setzer Biddix (the "Biddixes") settled their personal injury lawsuit against a medical doctor for the allegedly negligent care and treatment of their son which was alleged to have resulted in spastic quadriplegia, cerebral palsy and severe brain damage. On that date, the Biddixes executed a Settlement Agreement with Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), pursuant to which Medical Mutual agreed to pay the Biddixes the following sums:

(a) $142,857.14 upon execution of the Settlement Agreement;

(b) $407,142.86 to the trustee for Joseph Edwin Biddix upon execution of the Settlement Agreement; and

(c) monthly payments as follows:

(i) 24 monthly payments of $4,000.00 commencing on December 1, 1990 and continuing through November 1, 1992; and

(ii) monthly payments of $5,400.00 commencing on December 1, 1992 to be paid each month for the life of Joseph Edwin Biddix or 25 years, whichever is longer, such monthly

payments to be increased at an annual compound rate of 3% (the monthly payments described above shall hereinafter be referred to as the "Periodic Payments").

The Settlement Agreement further provided that Medical Mutual was to make a "qualified assignment" to defendant First Colony Life Insurance Company ("First Colony") of Medical Mutual's obligation to pay the Biddixes the Periodic Payments. (Salani Aff., Exhibit A).

Subsequently, Medical Mutual agreed to and did enter into a "Uniform Qualified Assignment and Release" ("Qualified Assignment") with defendant Jamestown Life Insurance Company ("Jamestown"), a subsidiary or affiliate of First Colony, pursuant to which Medical Mutual assigned to Jamestown the obligations and liabilities of Medical Mutual to make the Periodic Payments to the Biddixes. (Booker Aff., Exhibit B).

On or about October 1, 1990, Jamestown purchased an "Annuity Contract" from First Colony for the benefit of the Biddixes to fund its liability to make the Periodic Payments. Pursuant to the terms of the Annuity Contract, First Colony agreed to pay to the Biddixes the Periodic Payments. (Salani Aff., Exhibit C).

On or about July 22, 1997, the Biddixes entered into a Purchase Agreement (the "Purchase Agreement I") with Singer Asset Finance Company, LLC ("Singer"), pursuant to which Singer purchased all of the Biddixes' rights, title and interest in

and to a specified portion of the Periodic Payments (the "Assigned Assets I").[1] (Salani Aff., Exhibit D). Pursuant to the terms of the Purchase Agreement I, Singer purchased and the Biddixes absolutely assigned to Singer the Assigned Assets I subject to the terms and conditions set forth in the Purchase Agreement I.(Id.).

To effectuate the assignment to Singer of the Assigned Assets I, the Biddixes executed, among other documents, a Notice of Direction of Payments dated July 29, 1997 pursuant to which they directed Jamestown and First Colony, among other things, to make all future payments to the address set forth in the Notice of Direction of Payments. In addition, the Biddixes and Singer executed a Notice of Assignment which would notify Jamestown and First Colony of the assignment of the Assigned Assets I to Singer.[2] Because of the subsequent assignment by Singer to plaintiff Settlement Funding, LLC, d/b/a Peachtree Settlement Funding ("PSF"),[3] the Notice of Assignment was not sent by Singer. Instead, PSF sent a Notice of Assignment to Jamestown and First Colony to notify them of the assignment by the Biddixes of the Assigned Assets I to PSF. (Salani Aff., Exhibits D and E).

On or about October 28, 1997, Singer entered into an Assignment Agreement with PSF (the "Singer/PSF Assignment Agreement") pursuant to which Singer assigned to PSF all of its rights, title and interest in the Purchase Agreement I, including the right to receive the Assigned Assets I. (Salani Aff., Exhibit I).

---

1. The Assigned Assets I consist of "120 monthly payments of $5,000.00 commencing December 1, 1997 through and including November 1, 2007." (Salani Aff., Exhibit D).

2. Also in connection with the execution of the Purchase Agreement I, the Biddixes executed the following documents:
   (a) An "Absolute Assignment and Waiver of Claim" executed by the Biddixes on or about July 29, 1997, pursuant to which the Biddixes irrevocably and absolutely waived any right, claim, interest, power and privilege to the Assigned Assets I;
   (b) a "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or

about July 29, 1997, appointing Singer as their attorney in fact for the purposes stated therein; and
   (c) another separate "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about July 29, 1997, appointing Singer as their attorney in fact for the purposes stated therein.
(Salani Aff., Exhibits F–H).

3. PSF is engaged in the business of, among other things, purchasing structured settlement payment streams funded by annuities. (Salani Aff., ¶ 2).

In connection with the execution of the Singer/PSF Assignment Agreement and to effectuate the assignment of the Assigned Assets I to PSF, on or about November 3, 1997, the Biddixes executed a Notice of Assignment and a Notice of Change of Address pursuant to which the Biddixes and PSF, together, notified Jamestown and First Colony of the assignment to PSF and directed, among other things, that all future payments of the Assigned Assets I be made to PSF as set forth therein.[4] (Salani Aff., Exhibit J and K).

Having received no acknowledgment from defendants of their obligation to honor the assignment of the Assigned Assets I to PSF, PSF again notified defendants of the assignment to PSF by letter dated December 12, 1997. Subsequently, PSF made repeated attempts to contact First Colony. First Colony never responded to the December 12, 1997 letter or any of PSF's subsequent attempts to contact it. (Salani Aff., Exhibit O).

4. Also in connection with the execution of the Singer/PSF Assignment Agreement, the Biddixes executed the following documents:

(a) An "Absolute Assignment and Waiver of Claim" executed by the Biddixes on or about November 3, 1997, pursuant to which the Biddixes irrevocably and absolutely waived any right, claim, interest, power and privilege to the Assigned Assets I;

(b) a "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about November 3, 1997, appointing PSF as their attorney in fact for the purposes stated therein; and

(c) another separate "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about November 3, 1997, appointing PSF as their attorney in fact for the purposes stated therein.
(Salani Aff., Exhibits L–N).

5. The Assigned Assets II consist of 3 monthly payments of $1,260.08 commencing September 1, 1998 through and including November 1, 1998; 108 monthly payments of $1,447.89 commencing December 1, 1998 through and including November 1, 2007 (with a 3% increase every December 1st); and 66 monthly payments of $8,413.03 commencing December 1, 2007 through and including May 1,

On or about July 31, 1998, the Biddixes entered into a Purchase Agreement (the "Purchase Agreement II") with PSF pursuant to which PSF purchased all of the Biddixes' rights, title and interest in and to a specified portion of the Periodic Payments (the "Assigned Assets II").[5] (Salani Aff., Exhibit P). Pursuant to the terms of the Purchase Agreement II, PSF purchased and the Biddixes absolutely assigned to PSF the Assigned Assets II, subject to the terms and conditions set forth in the Purchase Agreement II.(Id.).

To effectuate the assignment to PSF of the Assigned Assets II, the Biddixes and PSF executed a Notice of Assignment dated July 31, 1998, pursuant to which the Biddixes and PSF notified Jamestown and First Colony of the assignment to PSF and directed, among other things, that all future payments of the Assigned Assets II be made to the address set forth in the Notice of Assignment.[6] (Salani Aff., Exhibit Q).

2013 (with a 3% annual increase every December 1st). (Salani Aff., Exhibit P).

6. Also in connection with the execution of the Purchase Agreement II, the Biddixes executed the following documents:

(a) A Notice of Direction of Payments to Jamestown and First Colony executed by the Biddixes on or about July 31, 1998 directing these defendants to remit the payments of the Assigned Assets II to Edwin W. Biddix and Cynthia A. Biddix, Settlement funding, LLC, P.O. Box 101657, Atlanta, Georgia 30392–1657;

(b) an "Absolute Assignment and Waiver of Claim" executed by the Biddixes on or about August 3, 1998, pursuant to which the Biddixes irrevocably and absolutely waived any right, claim, interest, power and privilege to the Assigned Assets II;

(c) a "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about August 3, 1998, appointing PSF as their attorney in fact for the purposes stated therein; and

(d) another separate "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about August 3, 1998, appointing PSF as their attorney in fact for the purposes stated therein.
(Salani Aff., Exhibits R–U).

On or about September 1, 1998, the Biddixes entered into another Purchase Agreement (the "Purchase Agreement III") with PSF pursuant to which PSF purchased all of the Biddixes' rights, title and interest in and to a specified portion of the Periodic Payments (the "Assigned Assets III").[7] (Salani Aff., Exhibit V). Pursuant to the terms of the Purchase Agreement III, PSF purchased and the Biddixes absolutely assigned to PSF the Assigned Assets III, subject to the terms and conditions set forth in the Purchase Agreement III.(Id.).

To effectuate the assignment to PSF of the Assigned Assets III, the Biddixes and PSF executed a Notice of Assignment dated September 1, 1998, pursuant to which the Biddixes and PSF notified Jamestown and First Colony of the assignment to PSF and directed, among other things, that all future payments of the Assigned Assets III be made to the address set forth in the Notice of Assignment.[8] (Salani Aff., Exhibit W).

Defendants have refused to honor any of the assignments to PSF or the Notices with respect to the Assigned Assets. Until the filing of this suit, defendants continued to send the payments of the Assigned Assets to the Biddixes. (Salani Aff., ¶19). After this suit was filed on November 4, 1998, defendants ceased making any payments until the parties entered into an Interim Agreement on or about February 17, 1999. (Salani Aff., ¶19). Defendants have resumed making the payments pursuant to the Interim Agreement.

In this action, plaintiff seeks to have the court declare valid all the assignments to PSF which are described above.

## LEGAL DISCUSSION

### I. MOTIONS FOR SUMMARY JUDGMENT.

Rule 56 of the Federal Rules of Civil Procedure defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which

7. The Assigned Assets III consist of "12 monthly payments of $149.99 commencing December 1, 1999 through and including November 1, 2000; 12 monthly payments of $304.49 commencing December 1, 2000 through and including November 1, 2001; 12 monthly payments of $463.63 commencing December 1, 2001 through and including November 1, 2002; 12 monthly payments of $627.53 commencing December 1, 2002 through and including November 1, 2003; 12 monthly payments of $796.36 commencing December 1, 2003 through and including November 1, 2004; 12 monthly payments of $970.25 commencing December 1, 2004 through and including November 1, 2005; 12 monthly payments of $1,149.36 commencing December 1, 2005 through and including November 1, 2006; and 12 monthly payments of $1,333.84 commencing December 1, 2006 through and including November 1, 2007." (Salani Aff., Exhibit V).

8. Also in connection with the execution of the Purchase Agreement III, the Biddixes executed the following documents:

(a) A Notice of Direction of Payments to Jamestown and First Colony executed by the Biddixes on or about September 3, 1998 directing these defendants to remit the payments of the Assigned Assets III to Edwin W. Biddix and Cynthia A. Biddix, Settlement funding, LLC, P.O. Box 101657, Atlanta, Georgia 30392–1657;
(b) an "Absolute Assignment and Waiver of Claim" executed by the Biddixes on or about September 3, 1998, pursuant to which the Biddixes irrevocably and absolutely waived any right, claim, interest, power and privilege to the Assigned Assets III;
(c) a "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about September 3, 1998, appointing PSF as their attorney in fact for the purposes stated therein; and
(d) another separate "Special Irrevocable Durable Power of Attorney" executed by the Biddixes on or about September 3, 1998, appointing PSF as their attorney in fact for the purposes stated therein.
(Salani Aff., Exhibits X–AA).

it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991).

In meeting this initial responsibility, for issues on which the movant would bear the burden of proof at trial, "that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Four Parcels of Real Property,* 941 F.2d at 1438 (citations and internal quotation marks omitted). For issues on which the non-movant would bear the burden of proof at trial,

> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim.... [T]he moving party simply may show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels of Real Property,* 941 F.2d at 1438 (citations, footnote and internal quotation marks omitted).

In determining whether the movant has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598. Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), "... and all justifiable inferences are to be drawn in his favor." *Everett v. Napper,*

833 F.2d 1507, 1510 (11th. Cir.1987). The movant's failure to meet this initial burden ends the inquiry and summary judgment should be denied.

However, once the initial burden has been met the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). *Accord, Four Parcels of Real Property,* 941 F.2d at 1437–38. Denials or allegations by the non-movant in the form of legal conclusions which are unsupported by any specific facts have no probative value, and thus, are insufficient to create issues of material fact that would preclude summary judgment. *Broadway v. City of Montgomery,* 530 F.2d 657, 660 (5th Cir. 1976).[9] Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To avoid summary judgment on issues on which the movant would bear the burden of proof at trial, the non-movant "must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). For issues on which the non-movant would bear the burden of proof at trial and where the movant puts on evidence affirmatively negating the material fact, "the non-movant must respond with evidence sufficient to withstand a directed verdict motion at

---

9. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

trial on the material fact sought to be negated." *Id.* at 1116. Finally, for issues on which the non-movant would bear the burden of proof at trial and where the movant demonstrates an absence of evidence on the issue, the non-movant must respond either by "show[ing] that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, ... [or by] com[ing] forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17.

In its summary judgment motion, plaintiff seeks to have the court declare that the above described assignments to plaintiff were valid.[10] Plaintiff asserts that the assignments were and are valid and it has made attempts to have defendants acknowledge the assignments and make payments directly to plaintiff. Plaintiff contends that, despite the absence of any restrictions or prohibition against the assignments in the applicable documents, defendants have refused to acknowledge the assignments. In opposition, defendants argue that the assignments are barred by the Settlement Agreement executed by the Biddixes, the Qualified Assignment and the Annuity Contract. Defendants further argue that statutory, tax and public policy concerns preclude the assignments at issue.

■ As a preliminary matter, the court must determine which state's law governs the substantive issues in this case. To that end, the court looks to Georgia's choice of law rules. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Georgia courts apply the rule of lex loci contractus. "Under this approach, [contracts] are to be governed as to their nature, validity and interpretation by the law of the place

where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made." *General Telephone Co. of Southeast v. Trimm,* 252 Ga. 95, 311 S.E.2d 460 (1984) (internal quote and cite omitted). "In order to determine where a contract was made, the court must determine where the last act essential to the completion of the contract was done." *Id.*

While the express terms of the Settlement Agreement provide that its validity, construction, interpretations and administration shall be governed by North Carolina law, the express terms of the Qualified Assignment provide that it shall be governed by and interpreted under the laws of the State of Virginia. (Salina Aff., Exhibit A, B). In addition, the Annuity Contract, which does not expressly provide the governing law, appears to have been entered into in Lynchburg, Virginia. Clearly, North Carolina law governs the Settlement Agreement while Virginia law governs the Qualified Assignment. Since the last act essential to the completion of the contract was performed in Virginia, the Annuity Contract too is arguably governed by Virginia law.[11] Hence, the applicable law in this case is that of either North Carolina, Virginia or both. It is not necessary for this court to decide precisely which of the two state's law should apply because under either law, the result would be the same.

■ Under North Carolina law, the principle is "firmly established" that a contract for money to become due in the future may be assigned, unless expressly prohibited by statute or public policy. *Bank of Northampton v. Town of Jackson,* 214 N.C. 582, 200 S.E. 444 (1939). The Supreme Court of North Carolina expanded these two exceptions when it held that, under general principles of contract law,

---

10. It is not disputed that an actual controversy exists here, as that term is defined in the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

11. The court notes that the face of the Annuity Contract indicates that First Colony, with its home office in Virginia, agreed to pay the Periodic Payments to the Biddixes in North Carolina.

assignment of contract rights is allowed "unless prohibited by statute, public policy, or the terms of the contract, or where the contract is one for personal services or is entered into out of personal confidence in the other party to the contract." *Kraft Foodservice, Inc. v. Hardee*, 340 N.C. 344, 348, 457 S.E.2d 596 (1995) (assignment of corporate officer's guaranty of corporation's obligation to supplier held valid and enforceable).

Virginia law does not appear to be contrary to the above described North Carolina law. The court is not aware of, and the parties have not submitted to the court, any Virginia law squarely on point. The courts applying the laws of both states have confirmed the assignability of contract right, including those for payment of money. For example, in *Florance v. Kresge*, 93 F.2d 784 (4th Cir.1938), the court held that, under Virginia law, where an executory contract has become executed to the extent that no obligation remains except the payment of money, the right to receive the payments becomes assignable despite contractual terms prohibiting assignment. *See also Munchak Corp. v. Cunningham*, 457 F.2d 721, 725–26 (4th Cir.1972) (holding that, under North Carolina law, a personal service contract could be assigned where the character of the performance and the obligations will not be changed, even in the face of an express prohibition on assignment).

■■■ "While parties generally have a right to transfer property freely, they may agree by contract to give up that right, and such an agreement will generally be given full effect by the courts." *Johnson v. First Colony Life Ins. Co.*, 26 F.Supp.2d

1227 (C.D.Cal.1998) (holding that an assignment was unenforceable where the agreement provided that "Johnson shall [not] have the power to sell or mortgage or encumber [the right] or any part thereof or anticipate the same or any part thereof by assignment or otherwise"). As defendants accurately point out, "[c]ourts, even in equity, must respect lawful contracts made by competent persons, and sympathy is not a ground for equitable relief." *McClellan v. Ashley*, 200 Va. 38, 42, 104 S.E.2d 55, 58 (1958). To that end, the court now turns to the specific contracts at hand.

It cannot be disputed that the only contract to which the Biddixes were parties and signatories (prior to the assignment agreements) is the Settlement Agreement. (Salina Aff., Exhibit A). The Biddixes are clearly bound by the terms of the Settlement Agreement. It does not contain any express restriction on or prohibition against the assignment of the Biddixes' rights to receive the Periodic Payments. As plaintiff points out, the only instances where the form of the word "assign" appears in the Settlement Agreement is where it provides that its terms are binding on the Biddixes' "successors and assigns". The Settlement Agreement thus appears to even contemplate assignment by the Biddixes of the rights granted therein, including the right to receive the Periodic Payments: "the parties hereto have agreed upon a compromise settlement of all claims made by [the Biddixes], their heirs, personal representatives, agents and assigns ..." (Salina Aff., Exhibit A, p. 1).[12] The Court of Appeals of North Carolina concluded that a contract

---

12. The term "assign" also appears in the following paragraphs of the Settlement Agreement:

> Edwin Wilson Biddix, as Guardian ad Litem for Joseph Edwin Biddix, and individually, and Cynthia Setzer Biddix, individually, their heirs, personal representatives, successors, agents and assigns, do hereby forever release and discharge [the specified individuals and entities] of and from any and all actions, causes of action, claims and

demands of any kind whatsoever [as specified herein]....

> It is expressly understood and agreed that Edwin Wilson Biddix and Cynthia Setzer Biddix, individually and on behalf of their heirs, personal representatives, successors and assigns, do hereby agree to hold harmless and indemnify Medical Mutual and [others specified] of and from any and all judgments [as specified].

(Salani Aff., Exhibit A, ¶ 8).

containing similar language was assignable. *Gillespie v. DeWitt*, 53 N.C.App. 252, 262, 280 S.E.2d 736, 747 (1981) (holding that language that a contract was binding upon "legal representatives and assigns" revealed the "intention of the parties that guaranty be assignable").

■ Defendants contend that certain other language in the Settlement Agreement prohibits assignments. Defendants assert that the Agreement's prohibition against the Biddixes' "right to accelerate, defer, increase or decrease the amount of" the Periodic Payments prohibits the Biddixes from assigning their rights to receive the Periodic Payments. (Salani Aff., Exhibit A, ¶ 5). As plaintiff submits, a transfer of payment rights would not accelerate, defer, increase or decrease any payments from defendants. An assignment merely causes the payments from Jamestown to be made to plaintiff instead of the Biddixes. The assignment has no effect on the timing of the payments, the duration of the payment stream or the amount of the payments.

■ It is not disputed that the benefits to be paid to the Biddixes under the Settlement Agreement were intended to meet all of the requirements of the Internal Revenue Code ("Code") for tax-free treatment as compensation for personal injuries. (Salani Aff., Exhibit A, ¶ 9). As the Third Circuit Court of Appeals carefully analyzed in its comprehensive discussion in *Western United Life Assurance Co. v. Hayden*, 64 F.3d 833, 839–40 (3rd Cir. 1995), to obtain the tax-favored treatment the Biddixes "must not have actual or constructive receipt of the economic benefit of the payments." *Id.*

So that the Biddixes would not receive a "present economic benefit" or have "constructive receipt" of the settlement amount, they agreed not to "accelerate, defer, increase, or decrease" any scheduled payments in the Settlement Agreement. *Id.* Defendants claim that the Biddixes' assignment of their rights under the Settlement Agreement "*may* result in the payments being declared as taxable compensation, and the Biddixes *may* be deemed to have accelerated and received a current economic benefit of future payments." (Booker Aff., ¶¶ 13–17) (emphasis included). This is pure speculation. *See Western United*, 64 F.3d at 840 (rejecting the argument that a subsequent assignment would cause a settlement company to retroactively lose the income exclusion provided by section 130).

As defendants argue, the Internal Revenue Service ("IRS") could take the position that the purported sale of payments under a structured settlement alters the tax treatment of the settlement for all parties, i.e., the settlement recipient, the annuity owner, and the annuity issuer. (Booker Aff., ¶¶ 13–17). However, a review of the statute reveals that it is unlikely for the following reasons. The "Periodic Payment Settlement Act of 1982" (P.L. 97–473) amended Section 104 of the Code to permit a Claimant (e.g., the Biddixes) to exclude from gross income damages received on account of personal injuries or sickness whether paid as a lump sum or through periodic payments over time. Prior to this Act, it was not clear whether section 104 excluded payments received over time from the income of the Claimant, although several IRS rulings had concluded that such payments were excluded. *See* H.Rept. 97–832 (97th Cong., 2d Sess.); H.Rept. 97–984 (97th Cong., 2d Sess.); Rev.Rul. 79–313, 79–2 CB 75; Rev.Rul. 79–220, 79–2CB 74.

In addition, the 1982 Act created a new Section 130 to codify the tax consequences of the assignment of the liability to make periodic payments from the original settling party (e.g., Medical Mutual) to a Payment Company (e.g., Jamestown). Section 130 provides that any amount received for agreeing to a qualified assignment of liability shall not be included in the gross income of the assignee (the Payment Company) to the extent that such amount does not exceed the aggregate cost of any "qualified funding asset"—defined as "any annuity contract issued by a company li-

censed to do business as an insurance company under the laws of any State, or any obligation of the United States" the payments from which are used to satisfy the obligation to make periodic payments. 26 U.S.C. § 130(d).

An assignment of liability to make periodic payments for personal injuries is treated as a qualified assignment under § 130(c) so long as the following requirements are met: (1) the Payment Company must assume the liability from a party to the suit or agreement; (2) if periodic payments are to be made: (A) such payments must be fixed and determinable as to time and amount; (B) payments cannot be accelerated, deferred, increased, or decreased by the Claimant; (C) the obligation assumed can be no greater than that of the Obligor; and (D) the periodic payments must be excluded from the gross income of the Claimant under § 104(a)(2); and (3) the Payment Company must secure the liability through the purchase of a qualified funding asset. The effect of Section 130 is to match the timing of the income from receipt of a qualified assignment with the deductions the Payment Company is permitted to claim when payments are made to a Claimant in satisfaction of a settlement agreement.[13]

■■■ Apparently, the IRS has not yet issued any regulations, private rulings or other pronouncements on the question of the tax consequences of the assignment of periodic payment rights.[14] The words of the statute, however, do not prohibit the sale, alienation, hypothecation, pledge, assignment or any other transfer of payment rights. Had Congress sought to prohibit assignments, it could have stated so explicitly in the statute, just as it listed those actions it did seek to prohibit. When a legislative body specifically lists certain items in a statute, the statute generally is not interpreted to encompass other items not specifically listed. *United States v. Koonce*, 991 F.2d 693, 698 (11th Cir.1993). Hence, the absence of a specific prohibition on assignment or any other transfer supports the conclusion that such transfers are not prohibited by section 130.

■■■ In addition, the Biddixes' selling their rights to the Periodic Payments would not cause them to be in constructive receipt of the structured settlement amount. An amount is constructively received if it is "credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. .Howev-

---

**13.** Hence, section 130 was enacted to enable either a tortfeasor or its insurer to assign its liability under a settlement agreement together with an amount necessary to fund that liability, without the transferred amount being included in the income of the assignee in the year of receipt. *See* PLR 8248073 (8/31/82); PLR 8038044 (6/24/80); Cong. Record 30462 (12/10/81). Any assignment of payment rights under a structured settlement agreement necessarily occurs after the agreement is in place. The assignment of payment rights would not alter the obligation of the Payment Company to continue to make the payments pursuant to the agreement. Hence, the possibility of such a subsequent assignment would not and could not have affected the creation of the settlement in the first instance, and thus would not have interfered with the purpose of section 130 to facilitate the creations of such arrangements.

**14.** John Chapoton, Assistant United States Treasury Secretary for Tax Policy from 1981 to 1984, who was actively involved in the drafting of Sections 104 and 130 and testified before the House Ways and Means Committee when these provisions were enacted in 1982, testified on March 18, 1999 before the house Ways and Means Committee:

> [T]he sale of structured settlement payments by a claimant should have no adverse tax consequences to any party . . . The notion that a sale by a claimant, many years after the fact, could somehow cause the structured settlement company to lose its original benefit under Section 130 (or could somehow cause constructive receipt to be revisited) is nonsensical. It cannot be a serious assertion.

Testimony of John E. Chapoton, Esq., March 18, 1999, United States house of Representatives Ways and Means Subcommittee on Oversight.

er, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." Treas.Reg. § 1.451–2(a). Constructive receipt means "income that is subject to a man's unfettered command ... that he is free to enjoy at his own option ... whether he sees fit to enjoy it or not." *Corliss v. Bowers,* 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930). The IRS has stated the rule as follows: "In essence, the obligee's demand for payment must be the only thing that would be necessary for payment." PLR 9639016.

As set forth in section 130, the ability of a Claimant to unilaterally accelerate, defer, increase or decrease the amount of any payments would cause the Claimant to be in constructive receipt. In those situations, the Claimant could demand to receive the payment from the Payment Company. The Biddixes have no unilateral right to demand payment from either Jamestown or plaintiff. In fact, the Biddixes have no right to demand anything from Jamestown other than the payments when they are due. Similarly, neither plaintiff nor any other funding company is obligated to purchase payment rights from the Biddixes. No other party is obligated to accept the assignment. The assignment of a structured settlement payment requires an agreement between two parties. Notwithstanding any demand on the part of the Biddixes, no amounts would be paid by plaintiff absent such a bilateral agreement. Thus, there are substantial restrictions and hence no constructive receipt.

In a directly analogous context, the IRS has ruled that the ability of a lottery winner who receives his winnings in the form of an annuity to later sell the right to receive the payments does not cause him to be in constructive receipt of the entire amount. The IRS explained that, for constructive receipt to apply, an amount credited to an individual's account must be subject to unqualified demand. The lottery payments did not accelerate as a result of the assignment, and the winner's right to assign the payments was subject to several conditions that substantially restricted his right to receive the amounts. Thus, the IRS concluded the doctrine of constructive receipt would not apply. *See* PLR 9639016; PLR 96240009. *See also Stranahan's Estate v. C. I. R.,* 472 F.2d 867 (6th Cir.1973) (holding that the right to sell payment rights does not, in and of itself, constitute the anticipatory assignment of that income); PLR 9812027 (IRS ruling that a personal injury liability assigned by a defendant to a noninsurance company through a settlement agreement that includes a commutation provision will not prevent the arrangement from being treated as a qualified assignment under section 130(c)).

Thus, the Settlement Agreement's prohibition against the Biddixes' "right to accelerate, defer, increase or decrease the amount of" the Periodic Payments cannot be read to constitute an anti-assignment provision in the Settlement Agreement. Significantly, in every case that the court has reviewed in which the courts held assignments to be unenforceable, the language of the anti-assignment clause contained in the contracts was unquestionably clear. *See e.g., Mettler Toledo Inc. v. Republic Powdered Metals Inc.,* 1996 WL 285368 (Ohio App. 9 Dist. May 29, 1996) ("This warranty is not transferrable"); *Cloughly v. NBC Bank–Seguin, N.A.,* 773 S.W.2d 652, 655 (Tex.App.—San Antonio 1989) ("[Cloughly] shall not have the right to make any assignment or transfer any rights under this Agreement without the prior written consent."); *Parrish v. Rocky Mountain Hospital & Medical Services Co.,* 754 P.2d 1180, 1181 (Colo.App.1988) ("All benefits stated in the Contract are personal ... [and] may [not] be "assigned to any person, corporation or entity: Any attempted assignment shall be void."); *Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc.,* 230 Kan. 361, 634 P.2d 1123, 1125 (1981) ("The benefits of the Contract ... are personal ... and are not assignable"); *Grieve v. General American Life Insurance Co.,* 58 F.Supp.2d 319, 321 (D.Vt.1999) (neither Grieve "[n]or any Payee [shall] have the power to sell, mortgage,

encumber, or anticipate the periodic payments, or any part thereof, by assignment or otherwise"). The court cannot conclude that the parties manifested their intent to restrict the Biddixes' right to assign by including the above mentioned prohibition.[15]

■ Defendants then argue that the Biddixes cannot assign their rights under the Settlement Agreement because it provides that "Medical Mutual or its assignee . . . shall be the sole owner of [the] annuity contract and shall have all rights of ownership therein, including, without limitation, the right to change the beneficiary thereof." (Salani Aff., Exhibit A, ¶ 3). The Biddixes do not purport to assign any rights to the Annuity Contract: They are not and they do not claim to be the owners of the annuity.[16] The purchase of the annuity by Jamestown "is merely a matter of convenience to the [Biddixes] and does not give [them] any right to the Annuity itself." *Western United*, 64 F.3d at 840. Moreover, the purchase of the annuity did not release Jamestown of its obligations under the Qualified Assignment. The annuity was purchased by Jamestown merely "[t]o fund [its] obligation to make the Periodic Payments." (Salani Aff., Exhibit B, ¶ 4). What the Biddixes have assigned, as clearly set forth in the various Purchase Agreements, are their rights to receive the Periodic Payments under the Settlement Agreement from an annuity or otherwise.

This point is clearly illustrated when comparing the facts at hand to those involved in *Allstate Insurance Co. v. American Bankers Insurance Company of Florida*, 882 F.2d 856 (1989), where the Fourth Circuit Court of Appeals held that, under Virginia law, assignment of an annuitant's right to receive his monthly payments was not enforceable. In that case, as part of a structured settlement of a personal injury claim by Deisher against one of its insureds, Allstate Insurance caused Allstate Life to issue to Allstate Insurance an annuity policy in which Allstate Insurance was named as the "owner" of the annuity and Deisher was named the annuitant thereof. Subsequently, Deisher's friend, one Kosko, was arrested and charged in a crime. To help Kosko, Deisher executed an assignment to Roberts, a bail bondsman, wherein Roberts agreed act as a surety for Kosko's bail bond, conditioned upon Kosko's appearance for trial. The crime for which Kosko was charged was specifically mentioned in the assignment. In consideration, Deisher agreed to assign certain of his rights in the annuity contract and proceeds due thereunder to Roberts. Thereafter, an indictment was returned charging Kosko with the single violation and an additional more serious indictment of which Deisher was unaware. Kosko then violated the conditions of his bond by failing to appear, and remained a fugitive. Kosko's bond was forfeited by the court and judgment was rendered in favor of the

---

15. Even if such a prohibition can be construed to be an anti-assignment clause, the court notes that § 322 of the Restatement (Second) of Contracts (1981) provides in relevant part that: "A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested . . . . gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective." The Third Circuit Court of Appeals recently held:

> To reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, . . . the assignment provision must generally state that nonconforming assignments (i) shall be 'void' or 'invalid,' or

(ii) that the assignee shall acquire no rights or the nonassigning party shall not recognize any such assignment. In the absence of such language, the provision limiting or prohibiting assignments will be interpreted merely as a covenant not to assign. . . . Breach of such a covenant may render the assigning party liable in damages to the non-assigning party. The assignment, however, remains valid and enforceable against both the assignor and the assignee.

*Bel–Ray Company, Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440–42 (3rd Cir. June 28, 1999) (internal quotes and cites omitted).

16. It cannot be disputed that the Biddixes were neither parties nor signatories to the Annuity Contract. (Salina Aff., Exhibit C).

United States of America and against Kosko and Roberts for $75,000. Roberts then demanded reimbursement from Deisher and Allstate Life pursuant to the assignment.

Deisher instituted an action against Roberts in which he sought rescission of the assignment upon the ground that it did not constitute a valid assignment. Allstate Life and Allstate Insurance intervened and interpleaded, requesting among other things that "the court determine whether the annuity and the annuity payments were assignable by any person other than Allstate Insurance, the named 'owner' thereof in the annuity policy." *Id.* at 859. In so doing, the Fourth Court of Appeals held that:

> It is axiomatic that one may not sell, assign or hypothecate that which he does not own. Deisher had no ownership in the annuity itself. The annuity policy plainly stated ... that Allstate Insurance was the owner of the annuity. Thus, Deisher could not lawfully assign that annuity, wherefore the purported assignment did not constitute a valid legal assignment.

*Id.*

Unlike *Allstate Insurance Co.,* however, the specific issue in this case is not whether the Biddixes can assign their rights to annuity payments but whether they can assign their rights under the Settlement Agreement.[17] In analyzing the specific issue at hand as defined by Allstate Life and Allstate Insurance, as stated above, the Fourth Circuit Court of Appeals did not have an occasion to address the settlement agreement involved in that case. Other than mentioning that the annuity policy had been issued as part of structured settlement of personal injury claim, the only contracts to which the court referred are

the assignment agreement and the annuity policy. The opinion does not indicate what Deisher's rights were under the settlement agreement or whether there was an anti-assignment clause in the settlement agreement.

In the assignment agreement in *Allstate Insurance Co.,* Deisher specifically "assign[ed] all of his right, title and interest to and in the ... annuity contract and proceeds due thereunder from Allstate Insurance up to and including the sum of $75,000, together with" interest and costs, expenses, and attorney fees incurred by the bail bondsman should forfeiture of that bond occur. *Id.* at 857. In the assignment agreements in this case, however, the Biddixes "assign[ed] ... [their] right, title and interest ... in and to the 'Assigned Assets'" The "Assigned Assets" in turn are defined in the agreements as:

> All right, title and interest of [the Biddixes] ... to receive [certain specified p]ayments due to [them] ... in, to and under the [Settlement Agreement], the Annuity (or any funding asset substituted for the Annuity) the Qualified Assignment and any other documents executed in connection therewith or otherwise relating to the foregoing and all right, title and interest of [the Biddixes] ... to receive any monies under or pursuant to such agreements, any monies actually received by [the Biddixes] pursuant to or by reason of any of such agreements, the right to receive the "qualified funding asset" as defined in the Qualified Assignment and any interest on the proceeds of all of the above composing or comprising all or any portion of the Assigned Payments....

(Salani Aff., Exhibits D, P, V). Unlike Deisher, the Biddixes assigned their rights under the Settlement Agreement, not the

**17.** The Fourth Circuit Court of Appeals also held that the equities in that case did not mandate the enforcement of the assignment particularly since the bail bondsman had been told prior to the assignment that the annuitant's interests were not assignable. *Id.* at 860. That Court further held that, after Deisher entered into the purported assignment

as security for a bail bond for Kosko, a subsequent indictment that charged the suspect with a much more serious crime released Deisher of whatever obligation he may have had to pay Roberts. *Id.* at 861–62. These are considerations not at issue in this case and further distinguish this case from *Allstate Insurance Co.*

Annuity Contract. The Annuity is mentioned in the assignment agreement to the extent that it affects the Biddixes' rights under the Settlement Agreement. In fact, the language, "or any funding asset substituted for the Annuity", anticipates possible elimination of Annuity altogether.

 Defendants next argue that the Biddixes do not have any right to assign under the Settlement Agreement because it provides that Jamestown, as the assignee of the proposed qualified assignment, shall be the sole obligor with respect to the obligations assigned. (Salani Aff., Exhibit A, ¶ 7). Defendants argue that, if Jamestown is the sole obligor to the Biddixes pursuant to the Qualified Assignment, the Biddixes cannot contend that their rights to assign payments stem from Medical Mutual's obligation in the Settlement Agreement as opposed to the Jamestown's obligation set forth in the Qualified Assignment.

It is apparent, however, that Medical Mutual is not completely off the hook. In the Qualified Assignment, "[Medical Mutual] agrees to indemnify and to hold harmless [Jamestown], its agent, and its employees from and against all claims, damages, losses, and expenses (including reasonable attorney's fees) from making payments as directed by [Medical Mutual]". (Salani Aff., Exhibit B, ¶ 1). In ad-

dition, the Qualified Assignment provides that "to the extent that [Medical Mutual]'s obligation to make any payment (or any portion thereof) is invalid, unenforceable, or subject to any defense, [Jamestown]'s obligation shall be equally invalid, unenforceable, or subject to such defense." [18] (Id. at ¶ 3). Clearly, Jamestown's obligations originate entirely from the Settlement Agreement and are dependent upon it. The Settlement Agreement's requirement that the Biddixes and their "successors and assigns ... completely release and discharge Medical Mutual from all obligations as are assigned to [Jamestown]," appears to have been intended to preclude the Biddixes from double claiming (i.e., once from Jamestown and again from Medical Mutual).

Even assuming arguendo that the rights the Biddixes assigned were pursuant to the Qualified Assignment, not the Settlement Agreement, that contract contains no express prohibition against the assignment by the Biddixes' of their rights to receive the Periodic Payments. The Qualified Assignment Agreement is a form contract with blank spaces which were typed in. In the blank space provided for "Recipient–Secured Party:" is inserted "Joseph Edwin Biddix and Cynthia Setzer Biddix as parents and natural guardians of Joseph Edwin Biddix, Jr., a Minor." [19] Similarly, in

---

18. The Qualified Assignment further provides: "In the event the Settlement Agreement is declared terminated by a court of law, this Agreement shall also terminate. [The Biddixes'] security interest in the annuity will be released. [Jamestown] shall then assign to [Medical Mutual] ownership of any 'qualified funding asset' purchased hereunder to fund the Periodic Payments, and [Jamestown]'s liability for the Periodic Payments shall terminate." (Salani Aff., ¶ 3).

19. The Biddixes are referred to as the "Secured Party" in the Qualified Assignment because in it, Jamestown "assigns, pledges, and grants a security interest in the Annuity, which may be after-acquired, to the [Biddixes] in order to secure the promise of the [Jamestown] to make the Periodic Payments." (Salani Aff., Exhibit B, ¶ 5). The Qualified Assignment further sets forth:

[Jamestown] shall have the rights to receive and retain all benefits under the Annuity so

long as [Jamestown] has not failed due to insolvency or bankruptcy to make any of the Periodic Payments. All such rights shall cease, and all such rights shall vest in the [Biddixes], along with title to the Annuity, if any such failure is not cured by [Jamestown] within 90 days after receiving notice of such failure from the [Biddixes]. (Salani Aff., Exhibit B, ¶ 6). Thus, the Qualified Assignment created a secured transaction governed by Article 9 of the UCC. Section 9–318(4) provides that "[a] term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due." N.C.St. § 25–9–318(4); Va.St. § 8.9–318(4). Plaintiff argues that any provision in the Qualified Assignment that may be construed as an anti-assignment clause is invalid pursuant to § 9–318(4). In opposition, defendants argue that the UCC is

the blank spaces provided for "Assignor:", "Assignee–Debtor:" and "Annuity Issuer:" are typed in "Medical Mutual", "Jamestown Life" and "First Colony", respectively.[20] The only provision in the Qualified Assignment that could possibly be construed to be an anti-assignment clause is the provision that prohibits the Biddixes from accelerating, deferring, increasing, or decreasing any payment. (Salani Aff., Exhibit B, ¶ 2). For the reasons set forth above, this provision does not constitute a valid anti-assignment clause.

Under virtually identical facts, the United States Court of Appeals for the Third Circuit held that structured settlement payments, funded by an annuity, were assignable. *Western United*, 64 F.3d at 833. In that case, Hayden settled her medical malpractice suit in return for certain periodic payments. The defendants entered into a qualified assignment with Reliance pursuant to which Reliance assumed the defendants' liability to make the periodic payments. With funds provided by the defendants, Reliance purchased an annuity from United to fund its assumed obligation to Hayden. Subsequently, Hayden executed a contract pursuant to which she assigned to Western United the structured settlement payments. Sometime thereafter, Hayden filed a Chapter 13 bankruptcy and sued Western United and Reliance claiming that the assignment to Western United was ineffective. The Bankruptcy Court found in favor of Hayden, and on

Western United's appeal, the district court affirmed, holding that the documents executed by Hayden failed to create an effective assignment. *Id.*

In reversing the district court, the Third Circuit Court of Appeals noted, among other things, that "[i]f the parties intended to structure the transaction pursuant to I.R.C. §§ 104 and 130, then they must have intended that the annuity be merely an accommodation and that Reliance have a general obligation to make the periodic payments." *Id.* at 841. The Court held that Hayden had the right to assign her rights to receive periodic payments under the settlement agreement, despite arguments that language in the annuity prevented such an assignment. The Court concluded that the language in the annuity applied only to the annuity payments, not the settlement payments.[21] *Id.* at 842.

The same analysis applies to this case. Defendants intended that the underlying transactions satisfy the requirements of sections 104(a)(2) and 130 of the Internal Revenue Code. Jamestown therefore continues to have a general obligation to make the Periodic Payments. The purchase of the Annuity from First Colony was merely a convenient mechanism to fund the obligation but in no way altered Jamestown's debt to the Biddixes. Following the cogent analysis set forth in *Western United*, as well as the reasons set forth in detail above, the court finds that the Biddixes

---

not applicable to the transactions involved in this case. Because the court concludes as a matter of law that there are no anti-assignment provisions applicable to the Biddixes, the court need not address this issue.

**20.** The signature page of the Qualified Assignment provides for two signatures to be affixed side by side: Signatures of Assignee–Debtor (Jamestown) and Assignor (Medical Mutual). Jamestown and Medical Mutual signed in the provided spaces. The Biddixes did not sign the Qualified Assignment. At the bottom of the page, R. Kent Brown, "Attorney for the Recipient–Secured Party" signed to indicate his "Approv[al] as to form and Content". (Salani Aff., Exhibit B).

**21.** That court noted specifically as follows:

[E]ven if the annuity contract's protection-from-creditors clause proscribed the payee from voluntarily assigning her rights to receive payments under the annuity, this would not imply that ... it prevents Ms. Hayden from assigning her rights to receive periodic payments under the settlement agreement.... [I]t is clear that the protection-from-creditors clause of the annuity applies only to the annuity payments. We find no evidence to support the proposition that this clause was intended also to apply to payments made under the settlement agreement. Consequently, we reject the Haydens' argument that Ms. Hayden's right to receive periodic payments under the settlement agreement was not assignable. *Id.* at 842.

were not prohibited by any provisions in the applicable contracts from assigning their rights to receive the Periodic Payments.

Defendants' argument that allowing an assignment of the Periodic Payments could subject them to multiple liability is not compelling. Defendants' argument is primarily based on a state trial court's decision in *Guthrie v. United States Fidelity & Guaranty Co.*, Palm Beach Cty.Cir.Ct. Case No. CL–97–005092–AD. *Guthrie* involved the assignment of a structured settlement of a worker's compensation claim where the plaintiff attempted to avoid his assignment and keep he payments for himself. He succeeded by invoking statutory anti-assignment provisions. In contrast, here, there is no provision, statutory or contractual, barring assignments. As to defendants' concern that they may be subject to competing claims to the Periodic Payments, the possibility of inconsistent claims to any type of payment always exists, whether an assignment is involved or not. An interpleader action would offer a solution in such situations.[22] Furthermore, the significance of these risks, such as they are, is diminished in this case by the fact that plaintiff filed a UCC–1 financing statements to give notice of the assignment and both Mr. and Mrs. Biddix were parties to the Settlement Agreement.

■ Finally, defendants argue that the "sale" of future settlement payments frustrates the basic purpose that the structured settlement tax rules are designed to serve: i.e., encouraging use of structured settlements to provide assured future payments to meet the needs of individuals who have suffered serious, often severely disabling injuries. Plaintiff submits that, other than the introductory statement of Senator Baucus, there is no support that Congress enacted Section 130 to protect Claimants from themselves—to prevent them from depleting lump sum settlements. Plaintiff also points out that the

periodic payments are not immune from the claims of creditors nor are they assets excludable from a bankruptcy estate.

The court is not convinced that there exists a public policy against the assignability of structured settlement payments to protect the recipients of the payments "from squandering their benefits." In support of its argument, defendants contend that such a policy is necessary to curve certain unethical activities by "gray market companies". Defendants allege that "gray market companies typically aggressively pursue and purchase payments from anyone . . . who is entitled to periodic payments . . . . for a fraction of their true value." (Defendants' Memorandum in Support of their Cross–Motion for Summary Judgment, pp. 22–23). Defendants point out that "[p]eople who are often unsophisticated and in difficult financial circumstances are the real victims of gray marketers' over-reaching practices." (Id. at p. 24).

In this regard, defendants do not cite any statute enacted by Virginia or North Carolina prohibiting assignments. Plaintiff points out that the Virginia legislature recently passed a law permitting assignments of structured settlements so long as certain disclosures are provided and the transfer is found to be in the best interests of the seller. 1998 Va.H.B.1922 (no retroactive application). In addition, Senate Bill 130, recently introduced in the Georgia General Assembly, does not prohibit assignments. It imposes certain conditions before an assignment could occur, including disclosures of certain key financial terms and a right of rescission. Assuming that the alleged "gray market companies" abound to exploit those who are entitled to periodic payments, the various legislatures appear to have determined that the solution is not to prohibit the assignments but to place certain precautionary mechanisms to safeguard consumers from possible abuse.

---

22. Typically, in such proceedings, defendants would file a complaint in interpleader paying the money at issue into the registry of the court and let the court decide who has priority. The primary dispute would be between the claimants to the payments.

Even assuming that there is such a policy, it has no application here. The Settlement Agreement was to provide the Biddixes with the funds necessary to provide for the care of their severely injured child over time. Unfortunately, the Biddixes' child is deceased. To the extent the Biddixes ever needed any protection from themselves to care for their son, that need is no longer present. The Biddixes will not have the expenses of the ongoing care of their child because he is no longer living. The parties to the Settlement Agreement obviously were aware of this potentiality since the structured settlement payments were designed to be paid for the longer of the life of the child or 25 years. Plaintiff presents that what the Biddixes did with the proceeds of the assignment was to start a successful business. Defendants have not shown that plaintiff is a "gray market company" or that its agreements with the Biddixes are somehow violative of a specific law.

Thus, the Biddixes' assignments of their rights to receive certain portions of the Periodic Payments due under the Settlement Agreement were not prohibited by any statutory or contractual anti-assignment provision and were not prohibited by any tax, statutory or public policy.

Therefore, the court hereby GRANTS plaintiff's motion for summary judgment and DENIES defendants' cross-motion for summary judgment.[23]

## II. MOTION FOR LEAVE TO FILE SUR–REPLY.

Plaintiff's unopposed motion for leave to file sur-reply in support of its motion for summary judgment is hereby GRANTED [24] [# 24].

## III. OBJECTIONS TO BOOKER AFFIDAVIT.

Plaintiff objects to certain portions of the Affidavit of Thomas L. Booker. Defendants have not opposed the motion. Plaintiff's objections are well taken to the extent that the affidavit contains statements that are irrelevant, speculative, lacking foundation, hearsay, unfairly prejudicial, argumentative or conclusory. The court notes that none of the newspaper articles submitted by defendants discussing certain structured settlement companies mentions plaintiff by name. Defendants' disparaging remarks about "gray market companies" in general will be taken for what they are. Defendants' unsupported accusations against plaintiff of certain unethical activities [25] will not be considered by this court.

Therefore the court hereby ACKNOWLEDGES plaintiff's objections [# 21–2].

## CONCLUSION

Therefore, the court hereby 1) GRANTS plaintiff's motion for summary judgment [# 10]; 2) DENIES defendants' cross-motion for summary judgment [# 16]; 3) GRANTS plaintiff's motion for leave to file sur-reply in support of its motion for summary judgment [# 24]; and 4) ACKNOWLEDGES plaintiff's objections to Booker Affidavit [# 21–2].

---

23. This court has not addressed and was not required to address whether the various "assignments to plaintiff were, are and will be in all respects proper, valid and effective." The court's specific holding is explicitly set forth above.

24. The court notes that plaintiff's objections to defendants' brief to the extent that it exceeds the page limitation provided in Local Rule 7.1D is moot as the court did not need to address the issues discussed in those pages.

25. For example, defendants accuse plaintiff of using methods utilized by "gray market companies" which "are in some cases based on subterfuge and in all cases, heavy-handed." Defendants also appear to accuse plaintiff of depriving the Biddixes of a significant portion of their benefits because of "unconscionably high discount rates and other fees". These are not supported and they are not issues before the court.

The Clerk of the court is hereby DIRECTED to CLOSE this case.